## The PILLSBURY COMPANY

v.

### Fred HUENEFELD, Jr. and Elizabeth G. Huenefeld.

### Civ. A. No. 79-0933.

United States District Court,
W. D. Louisiana,
Monroe Division.

Oct. 19, 1981.

Charles S. Weems, III, Herbert J. Mang, Jr., Gold, Little, Simon, Weems & Bruser, Alexandria, La., John Hoychick, Jr., Cotton, Bolton, Roberts & Hoychick, Rayville, La., William A. Hargiss, Monroe, La., for plaintiff.

Crawford A. Rose, Jr., Rayville, La., James A. Rountree, Hudson, Potts & Bernstein, Monroe, La., Donald K. Carroll, Hamilton, Carroll & Miller, Oak Grove, La., for defendants.

## OPINION

NAUMAN S. SCOTT, Chief Judge.

Plaintiff, the Pillsbury Company (Pillsbury) filed suit on July 11, 1979, to foreclose on a collateral mortgage that was executed by defendant Fred Huenefeld, Jr. (Huenefeld), to secure his obligation under a continuing guaranty agreement. That agreement was entered into for the purpose of ensuring the performance of Riverport Terminal, Inc. (Riverport), a now defunct grain storage facility, in its obligation to purchase and store soybeans for Pillsbury in return for the latter's inventory financing.

Harry R. Henderson (Henderson), one of the other guarantors, with Huenefeld, had filed suit on July 10, 1979 against Pillsbury and the four remaining co-guarantors in the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana (No. 118878). Huenefeld and Henderson sought declaratory relief on several issues regarding the ramifications of both the continuing guaranty agreement and the underlying contract between Pillsbury and Riverport in light of Riverport's inability to meet its obligations to Pillsbury. That suit was removed by Pillsbury. We subsequently denied Henderson's Motion to Remand and realigned the parties in the removed suit to reflect their true litigious interest.

Based on a motion by Huenefeld, the two suits were consolidated. Trial on the merits was held October 6 and 7, 1980. We chose to determine first, Huenefeld's liability to Pillsbury, if any, reserving for future consideration liabilities as among the guarantors.

## FINDINGS OF FACT

On November 10, 1976, by letter agreement, Riverport contracted with Pillsbury

to purchase and store commodities for Pillsbury at Riverport's Monroe, Louisiana facility from time to time, in return for 80% inventory financing by Pillsbury. This contract allowed for an additional 10% advance upon shipment. Each advance was made on presentation of a promissory note secured by a chattel mortgage on the grain to be shipped. Grain covered by each chattel mortgage was to be stored in separate bins. Huenefeld, Henderson, O. B. Frazier, J. M. Frazier, James Jacks and J. C. Gilbert, who organized, held stock in and were principals of Riverport, personally guaranteed[1] Riverport's performance.[2] Many security devices encumbering the soybeans purchased by Riverport under the contract were in fact executed.

Both Pillsbury and Riverport deviated from the letter agreement in many respects. However, the arrangement worked smoothly until early in 1979 when various problems were discovered. On two occasions in 1978, possibly due to duplicate requests by Riverport personnel, Pillsbury erroneously advanced monies for grain purchases already financed. These errors were not discovered at the badly mismanaged grain facility. After allowing for settlement adjustments, the excess advances totaled $338,000.00. On January 2, 1979, an advance of $119,600.00 was made without an accompanying promissory note. Riverport found it had no grain to show for that advance or three other advances in the amounts of $265,000.00, $235,100.00, and $136,300.00.

By January 1979, Pillsbury discovered one of the excess advances. The other was discovered in March of 1979. Pillsbury notified Riverport of the situation in a reasonable and timely fashion. A meeting between Riverport and Pillsbury officials took place at Pillsbury's Minneapolis, Minnesota offices on March 19, 1979, for the purpose of working out a settlement relating to the unaccounted for grain and excess advances. Prior to that meeting, Riverport made two payments to Pillsbury in the amounts of $50,000.00 and $111,400.00. As a result of the meeting, the additional sums of $65,386.00 and $65,025.00 were paid.

Thereafter, the guarantors made two payments to Pillsbury in the amounts of $150,000.00 and $100,000.00. On May 10, 1979, Huenefeld executed a collateral mortgage note secured by a collateral chattel mortgage, the object of the present suit. When the inevitability of Riverport's bankruptcy became clear, Pillsbury made written demand on the guarantors based upon the continuing guaranty. Thereafter, Riverport filed its bankruptcy application and Pillsbury sought to foreclose the real estate covered by the Huenefeld collateral mortgage.

The total amount of Riverport's indebtedness is $821,025.00. Regarding interest, paragraph 8 of the letter agreement provides:

"(A)dvances may be made by check or wire transfer of funds and are to be supported by handnotes and secured by properly recorded collateral pledge, collateral chattel mortgage, and collateral chattel mortgage note bearing interest from thirty days after advance at an interest rate of no less than ten percent per annum or 3½ percentage points above prime rate, which ever is higher."

As proven by Pillsbury, 3½ percentage points over the prime interest rate on the dates of the three secured advances for which no grain existed was eleven percent.

Concerning interest rates on unsecured advances that remain outstanding, the 11%

---

1. The pertinent language of the form agreement reads:

"In consideration of your extending credit to Riverport Terminal, Inc., Monroe, Louisiana, which we hereby request and *with whom or in which company we are financially interested and for value received*, we hereby jointly and severally guarantee the punctual payment to you at maturity all of ... its ...

indebtedness together with interest thereon ...". (emphasis ours).

2. Of the guarantors, Gilbert expressly limited his guaranty—to one-seventh of any indebtedness owed by Riverport to Pillsbury. Since the judgment sought in the instant action by Pillsbury is solely against Huenefeld, we refrain from considering Gilbert's status.

rate for the secured transactions does not apply. The contractual language relied upon by Pillsbury in ascertaining the 11% rate of interest requires the security of a collateral chattel mortgage and cannot fairly be applied to any unsecured debt. Pillsbury has waived the higher rate.

Pillsbury's two erroneous advances did not cause Riverport's financial collapse. Riverport was an unproven business entity. The arrangement between these entities enabled Riverport to operate. But for the contractual assurances by the guarantors of Riverport, no such arrangement would have been sensible for the financier (Pillsbury). Pillsbury required the continuing guaranty agreement to avoid the necessity of constantly supervising the newly formed and unproven grain facility. Had Riverport's bookkeeping approached the modicum of acceptibility, any excess advance would have been discovered. Only the management of Riverport can be held responsible for the empty bins at the storage facility.

We are unavoidably drawn to the conclusion that Riverport received not only multiple payments from Pillsbury for the same commodities, merely absorbing all those funds, but may have been paid by a third party as well who actually obtained the commodities in question. The guarantors stood to gain from the operation of Riverport, not only as its principals and shareholders, but as Riverport's suppliers of grain. As compared to a gratuitous, nonprofessional surety, Huenefeld was clearly and abundantly compensated for his guarantor status by the Pillsbury-Riverport operation.

## CONCLUSIONS OF LAW

### 1. *Solidary v. Simple Suretyship.*

■ We must first scrutinize the contract to construe the nature of the guaranty: Is Huenefeld a solidary obligor, thus individually liable for the entire debt or is he a simple surety, liable only to the extent of his virile share? [3]

Under La.C.C. art. 3035, continuing guaranty agreements are treated as a type of suretyship. *Brock v. 1st State Bank*, 187 La. 766, 175 So. 569 (1937). If the defendant is bound in solido with the debtor, La. C.C. art. 3045 instructs us that the provisions pertaining to solidary debtors will apply. *Louisiana Bank & Trust Co. v. Boutte*, 309 So.2d 274, 277–278 (La.1975).

The agreement among the parties is couched in common law terms: "We hereby jointly and severally guarantee ...". It is clear to this court that "(I)n Louisiana, the common law term 'joint and several' is considered synonymous with the Civil law term 'in solido'." *Johnson v. Jones-Journet*, 320 So.2d 533, 536 (La.1975); *Parrino v. Parrino*, 393 So.2d 761 (La.App.1980); La.C.C. art. 2082; c. f. La.C.C. art. 2088. In the present case, we hold that Huenefeld intended to be and is solidarily liable to Pillsbury.

### 2. *Modifications of the Underlying Contract as Affecting the Continuing Guaranty.*

■ Beyond our determination that Huenefeld is a solidary obligor, we must discern whether he is entitled to assert defenses that flow from the inherent bilateral [4] and accessory [5] nature of the suretyship contract. In other words, does the creditor's

---

**3.** Guarantors in solido can be sued individually for the entire debt. Contractual solidary obligors do not enjoy the benefits of discussion (La.C.C. arts. 3045–3046) or division (see La. C.C. art. 2094) which is "inimical to the essential nature of solidarity, i. e. the creditor's ability to collect the entire amount from any party solidarily bound." 36 La.L.Rev. 279, 282 (1975); *Hibernia Bank & Trust Co. v. Succession of Cancienne*, 140 La. 969, 74 So. 267 (1917); *Edward Bruce Co. v. Lambour*, 123 La. 969, 49 So. 659 (1909); *The Flintkote Co. v.*

*Thomas*, 223 So.2d 676 (La.App.1969). In fact, Huenefeld has not sought either of these codal advantages that accrue to simple sureties only.

**4.** The bilateral nature of the suretyship contract may be inferred from art. 3060: "The surety may oppose to the creditor all the exceptions belonging to the principal debtor and which are inherent to the debt ...". See 36 La.L.Rev., *supra*, at 279 and n.5, 281 and n.15.

**5.** La.C.C. art. 3035.

erroneous creation of part of the debt,[6] failure to oversee the activities of the principal debtor or secure all its indebtedness, preserve the underlying contract or insure the surety's right to legal subrogation [7] effectuate the discharge of Huenefeld's suretyship obligation?[8] In the alternative we must determine whether waiver provisions within the continuing guaranty at issue bar Huenefeld's defense that the above modifications by Pillsbury discharge his obligations to it.

*Louisiana Bank & Trust Co. v. Boutte, et al, supra,* indicates that notwithstanding deviations from the principal contract, in solido obligors remain solidarily liable for the debt. In *Boutte,* three of four solidary obligors and the principal debtor were released by the creditor, who reserved its rights against the remaining obligor. A continuing guaranty agreement therein contained a waiver provision covering that release as well as other possible actions by the creditor. The court held that "(t)he compromise and release of the principal debtor ... did not operate to release the solidary surety ..." where the creditor reserved its rights against that surety. *Id.* at 279; see La.C.C. art. 2203. In *Boutte,* the accessory nature of the guaranty was lost with no discharge of the co-obligor.

*Boutte* has been criticized for extending La.C.C. arts. 3045 and 2206 too far, i. e. ignoring the other rights of a surety not addressed by those articles. See 36 La.L. Rev. 279 (1975); 49 Tul.L.Rev. 1187 (1975). "As Aubrey and Rau state: '(S)olidary suretyship remains, though deprived of the benefit of discussion, and, in the proper case, of division, governed by the rules of simple suretyship.'" (footnote omitted). 49 Tul.L.Rev., *supra,* at 1191.

Extinction of solidary suretyships in Louisiana *has* been predicated upon the same considerations as those controlling extinction of simple suretyships. See *Alter v. Zunts,* 27 La.Ann. 317 (La.1875); *Succession of Daigle,* 15 La.Ann. 594 (La.1860); *Jones v. Fleming,* 15 La.Ann. 522 (La.1860); *Adle v. Metoyer,* 1 La.Ann. 254, 256 (La.1846); cf. *Brewer v. Foshee,* 189 La. 220, 179 So. 87 (1938). Although some of the cases cited by Huenefeld do not involve solidary sureties, considering the foregoing, it seems that such a distinction offers no resolution of the issue before us.

■ We are persuaded by a more profound distinction. Huenefeld stood as a compensated, as opposed to gratuitous, surety. Thus, in our view, he is not to be afforded the protections of La.C.C. art. 3039 and cases thereunder which require strict construction of contracts such as the one at issue in favor of non-professional sureties. The discharge of sureties provided by La. C.C. art. 3061 is not available here. (See footnote 8). We find that Huenefeld cannot rely on modifications by Pillsbury and Riverport to avoid his suretyship obligations to Pillsbury.

### 3. *The Waiver Provisions.*

■ Legal commentators point out that the *Boutte* court could have held the guarantors therein liable solely upon language in the continuing guaranty.[9] 49 Tul.L.Rev., *supra,* at 1192 and n.32; 36 La.L.Rev., *supra,* at 285, n.38. We note two cases where such express waivers were the bases for holdings that solidary sureties were not discharged even though the creditors varied the underlying contracts. *American Bank & Trust Co. v. Bluebird Restaurant & Lounge, Inc., et al.,* 290 So.2d 302 (La.1974); *Moriarty v. Bagnetto,* 110 La. 598, 34 So. 701 (1903).

In light of the foregoing we turn to the waiver provision within the continuing guaranty at issue. It states:

> subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety." (emphasis ours).

---

6. We have previously determined that Riverport should have discovered the erroneous advances.

7. La.C.C. arts. 2161(3), 3052 and 3053.

8. La.C.C. art. 3061 reads: "The surety is discharged when *by the act of the creditor,* the

9. See *Louisiana Bank & Trust Co. v. Boutte,* 309 So.2d 274, 276 at n.1.

"Notes and other evidences of indebtedness and things of value may be received by you on account or in adjustment or as security or in settlement of said indebtedness or any portion thereof and the same (and/or the original indebtedness) may be renewed extended, relinquished, substituted, modified, and/or enforced as you think advisable, all without notice to us or any of us, *and without impairing the liability under this guaranty.*" (emphasis ours).

We read the waiver provision at hand as allowing for modifications in the manner in which the *original indebtedness* was created. All the modifications undertaken were covered by this language. As an alternative holding, we find Huenefeld to be liable under the terms of this waiver.

Necessarily, negligent alterations were *not contemplated* in the waiver. However, we have found that plaintiff's actions did not in fact cause the impairment of Huenefeld's suretyship rights such as to discharge the surety under La.C.C. art. 3061.[10] The above-quoted provision does not differentiate between negligent as opposed to purposeful alterations in the continuing guaranty. For these reasons this distinction lacks merit.

### 4. *Interest.*

The applicable interest rate for the three secured advances is eleven percent and the unsecured indebtedness shall bear legal interest, commencing for both from thirty days after the date of advance.

 Based upon the foregoing, we find that Huenefeld is liable to Pillsbury for the full amount of the debt incurred by Riverport, plus interest at rates described herein. It appearing that the remaining litigation in this action does not involve diverse parties, we decline to exercise our ancillary jurisdiction and remand all remaining claims extant among the co-guarantors.

10. *Keller v. General Motors Acceptance Corp.*, 233 La. 320, 96 So.2d 598 (1958), cited to us by Huenefeld, is not persuasive authority on this point. In *Keller*, the negligence of the creditor directly caused the nullification of the principal

Pillsbury should present a proposed judgment consistent with this opinion to defendant Huenefeld for approval as to form and submit said judgment to this court within ten days of date.

debt and loss of the surety subrogation rights, just the situation La.C.C. art. 3061 (see f. 8) addresses. The surety did not contribute to the predicament nor did he benefit by the debtor's enterprises therein. Such is not the case here.